**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1790

DMARCIAN, INC.,

Plaintiff – Appellee,

v.

DMARC ADVISOR BV, f/k/a dmarcian Europe BV,

Defendant – Appellant.

No. 25-1084

DMARCIAN, INC.,

Plaintiff – Appellee,

v.

DMARC ADVISOR BV, f/k/a dmarcian Europe BV,

Defendant – Appellant.

Appeals from the United States District Court for the Western District of North Carolina at Asheville.  Martin K. Reidinger, District Judge.  (1:21−cv−00067−MR)

Argued:  May 7, 2026                               Decided:  July 10, 2026

Before WILKINSON and WYNN, Circuit Judges, and KEENAN, Senior Circuit Judge.

---

Affirmed in part and dismissed in part by published opinion. Judge Wilkinson wrote the opinion, in which Judge Wynn and Senior Judge Keenan joined.

---

**ARGUED:**  Matthew Aaron Hughes, FOX ROTHSCHILD LLP, Greenville, South Carolina, for Appellant.  Pamela Suzanne Duffy, ELLIS & WINTERS, LLP, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Gregory G. Holland, Greensboro, North Carolina, Matthew Nis Leerberg, FOX ROTHSCHILD LLP, Raleigh, North Carolina; Samuel B. Hartzell, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellant.  Tyler C. Jameson, ELLIS & WINTERS, LLP, Greensboro, North Carolina; David A. Dorey, BLANK ROME LLP, Wilmington, Delaware, for Appellee.

WILKINSON, Circuit Judge:

This appeal involves a cross-border intellectual property dispute between two software companies. dmarcian, Inc. (dInc), an American company with headquarters in North Carolina, alleges that DMARC Advisor BV (dBV), a Dutch company, stole its brand name, software code, and customers. The case was last before us in 2023. *See dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119 (4th Cir. 2023).

dBV argued last time that it was not subject to United States law. As it saw things, the alleged theft took place in the Netherlands, not the United States. We rejected that argument. Wherever the alleged theft took place, we held that it had effects in the United States that brought it within the reach of United States law.

dBV now makes the argument again, contending that the Supreme Court's intervening decision in *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023) should change our answer. We reject dBV's argument again. *Abitron* shifts our focus from effects to conduct, but dBV's alleged theft involved significant conduct in the United States too. The new rules in *Abitron* do not allow dBV to escape liability.

In the modern world, intellectual property theft often cannot be confined to a single sovereign. An actor in the Netherlands may traffic in American trademarks and trade secrets as if there were no national borders or ocean between them. Whether the effects of its conduct are under scrutiny, as before *Abitron*, or the conduct itself is under scrutiny, as now, the fundamental question remains whether the actor has sufficient interrelationships with the United States to make it an appropriate subject of our law.

3

The district court's second amended preliminary injunction, which is justified by dBV's conduct in the United States, comports with *Abitron*. We affirm the injunction and dismiss the remainder of dBV's appeal.

I.

The underlying facts of this case were set out in our 2023 opinion. It remains now, as it was then, a case about "a broken business relationship" between dInc and dBV. *dmarcian*, 60 F.4th at 128. This appeal, however, involves two new sets of issues.

A.

When dInc filed suit in North Carolina, it brought a litany of claims. dBV, it said, had breached the parties' contract and committed more than a dozen business torts and intellectual property violations. The district court found that dInc was likely to prevail on its copyright infringement, trademark infringement, trade secret misappropriation, and tortious interference claims. It thus issued a preliminary injunction against dBV.

On appeal, dBV argued that the preliminary injunction impermissibly sought to apply United States and North Carolina law to its activities abroad. We disagreed, explaining that the injunction was justified largely by the domestic effects of dBV's conduct. dBV had created a website that featured dInc's name and logo, the likenesses of dInc employees, and the identities of dInc customers. It had used this website to sell the same software product as dInc. The website had not merely reached American customers by accident. To the contrary, dBV placed a button on the website directed to customers in "the Americas," it sent messages to American customers, and it convinced at least one American company, Clarizen, to switch from dInc's software product to dBV's. We

4

affirmed the preliminary injunction because these effects in the United States were sufficient under then-binding precedent to bring dBV within the reach of United States law. *See dmarcian*, 60 F.4th at 138–43.

Only a few months later, in *Abitron*, the Supreme Court announced a new set of rules governing the territorial reach of intellectual property law. *See* 600 U.S. at 417–23. For unrelated reasons, the district court dismissed dInc's copyright claim. In response to both developments, the district court modified its preliminary injunction. The new injunction, labeled the second amended preliminary injunction, was intended to conform with *Abitron* and reflect that dInc no longer had a likelihood of success (or any chance of success) on its copyright claim. *See dmarcian, Inc. v. DMARC Advisor BV*, No. 1:21-cv-67, 2024 WL 5188766, at *3–6 (W.D.N.C. Dec. 20, 2024).

Under the terms of the second amended preliminary injunction, which remains in effect, dBV was prohibited from doing the following:

> (1) providing services to any customers located outside of Europe, Africa, or Russia . . .;
> (2) providing access to any of its websites to IP addresses from countries outside of Europe, Africa, or Russia. . . .;
> (3) making changes to the trade secret source code . . .;
> (4) using [dInc's] trademark in any manner in the United States or on any websites which are accessible to IP addresses from the United States, unless such use is accompanied by a [disclaimer]. . . .;
> (5) displaying any website with the "dmarcian" name which is accessible to IP addresses from the United States, unless that website includes a [disclaimer]. . . .;
> (6) redirecting, encouraging, or allowing any customer to change its payment recipient from [dInc] to [dBV]. . . .;
> (7) making any public statement about [dInc] except as expressly allowed or directed herein.

J.A. 2069–72.

5

dBV now appeals the second amended preliminary injunction.

B.

dInc is not the only party to this troubled relationship that believes it has been wronged. In the Netherlands, a reciprocal lawsuit brought by dBV charges dInc with misconduct.

After dBV filed its Dutch lawsuit, dInc asked the Dutch court to impose a stay pending the outcome of the American lawsuit. dInc pointed to a provision of Dutch law intended to prevent dueling suits over the same subject matter across national borders. In response, dBV told the Dutch court that no stay was warranted because the two suits addressed sufficiently distinct subject matter. dBV also said that, even if the subject matter of the two suits overlapped, the Dutch suit should take priority because it was filed first. The Dutch court agreed and declined to enter a stay.

Back in North Carolina, the district court took issue with what had transpired in the Netherlands. It concluded that dBV's arguments to the Dutch court had misrepresented the subject matter and start date of the American litigation. As a remedial measure, it ordered dBV to file a document with the Dutch court providing a corrected account ("the correction order"). *See dmarcian, Inc. v. DMARC Advisor BV*, No. 1:21-cv-67, 2023 WL 4223536, at *9–10 (W.D.N.C. June 27, 2023).

dBV filed the document. As a result, the Dutch court reversed its prior decision and stayed its proceedings. The district court in North Carolina nevertheless concluded that dBV had not filed the document in the manner directed by the correction order, so it held dBV in civil contempt and ordered dBV to pay dInc $400,000 ("the contempt order"). *See*

6

*dmarcian, Inc. v. DMARC Advisor BV*, No. 1:21-cv-67, 2024 WL 5193519, at *11 (W.D.N.C. Dec. 20, 2024).

dBV now appeals both the correction order and the contempt order.[1]

## II.

We begin with dBV's appeal of the second amended preliminary injunction. We have appellate jurisdiction over the injunction pursuant to 28 U.S.C. § 1292(a)(1). We review it for abuse of discretion, examining factual findings for clear error and legal conclusions de novo. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013).

dBV's primary contention is that the injunction runs afoul of the new extraterritoriality rules announced in *Abitron*. According to dBV, it did not engage in sufficient conduct in the United States to justify the application of United States law. dBV's secondary contention is that the injunction violates the specificity requirements in Federal Rule of Civil Procedure 65(d)(1). We address each contention in turn.

## A.

The extraterritoriality rules in *Abitron* are new in several ways.

The old rules came from *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952). Under *Steele*, the Lanham Act's prohibitions on trademark infringement and unfair competition usually applied if a defendant's conduct had "effects" in the United States, even if that

---

[1] The district court also held dBV's attorney in contempt and suspended him from practicing law in the Western District of North Carolina. The attorney's appeal of the contempt order is addressed in a separate opinion. *See dmarcian, Inc. v. Pressly McAuley Millen*, No. 25-1085, --- F.4th --- (4th Cir. 2026).

conduct occurred abroad. *Id.* at 286; *see also, e.g.*, *Nintendo of Am., Inc. v. Aeropower Co., Ltd.*, 34 F.3d 246, 250 (4th Cir. 1994) (applying *Steele* with a three-part test focused on "effects on commerce within the United States").

In the decades after *Steele*, the Supreme Court developed a more comprehensive two-step extraterritoriality inquiry. The inquiry is grounded in the presumption against extraterritoriality, a canon of statutory construction which counsels that "federal laws will be construed to have only domestic application" "[a]bsent clearly expressed congressional intent to the contrary." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016).

At step one of the inquiry, the Court asks whether the statutory provision at issue "gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 337. If so, the provision may apply extraterritorially. If not, the provision may only apply domestically. In the latter scenario, the Court proceeds to step two to determine whether the case at hand "involves a permissible domestic application" of the provision or "an impermissible extraterritorial application." *Id.* The case involves a permissible domestic application "[i]f the conduct relevant to the statute's focus occurred in the United States." *Id.*

The Court proceeded to apply this two-step inquiry to several statutory provisions. *See, e.g.*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265–67 (2010) (Securities Exchange Act of 1934); *RJR Nabisco*, 579 U.S. at 337–38 (Racketeer Influenced and Corrupt Organizations Act (RICO)); *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 412–13 (2018) (Patent Act); *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 632–33 (2021) (Alien Tort Statute). Then, in *Abitron*, the Court "put aside" *Steele* and applied the two-step inquiry to the Lanham Act too. *Abitron*, 600 U.S. at 422.

8

Pursuant to *Abitron*, two provisions of the Lanham Act—15 U.S.C. § 1114(1)(a) and § 1125(a)(1)—no longer apply extraterritorially. The conduct relevant to the focus of these provisions, which must occur domestically before the Act may apply, is "infringing use in commerce" of a trademark. *Abitron*, 600 U.S. at 422. Finally, *Steele*'s effects-focused test is no longer good law.

### B.

Although *Abitron* is new, the tensions it reconciles are longstanding.

Congress, if it wishes, may legislate "beyond the territorial boundaries of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). When it does so, however, it risks causing "international discord." *RJR Nabisco*, 579 U.S. at 335. Other nations may see the application of United States law in their territory as a violation of their sovereignty, and businesses may find it challenging to comply with overlapping or even conflicting legal regimes.

These risks are especially acute in the context of intellectual property law, which is generally territorial. A trademark has "a separate existence in each sovereign territory in which it is registered or legally recognized as a mark." *Abitron*, 600 U.S. at 426 (quoting 5 J. Thomas McCarthy, Trademarks and Unfair Competition § 29:1, at 29–4 to 29–5 (5th ed. 2023)). Patents and copyrights depend on national borders too, and "[f]oreign law may embody different policy judgments" than American law about the strength of protection they should be accorded. *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) (internal quotation marks omitted). If United States intellectual property law sought to rule the world, it would quickly bump up against other regimes.

9

At the same time, businesses today operate seamlessly across national borders. There are few more attractive markets than the United States, which promises a large consumer base and a judicial system that affords stability to commercial transactions. If foreign companies could operate in the United States and escape the reach of American intellectual property law by virtue of their national origin—or by virtue of their intermingled domestic and foreign operations—American companies would be left defenseless against even the most blatant acts of theft. This vulnerability would violate the fundamental promise of our laws "that the courthouse door is open to [American companies] when their intellectual property is misused." *dmarcian*, 60 F.4th at 147.

*Abitron* carefully balances these competing interests. While purely foreign conduct is now shielded from the Lanham Act, foreign actors who enter American markets and steal American intellectual property are not. "[D]ue regard" is given "both to international duty and convenience, and to the rights of [our] own citizens." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).

The balance struck by *Abitron* echoes that struck by the law of personal jurisdiction. When a defendant has "minimum contacts" with a forum, he may be haled into its courts. *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 12 (2025) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). A corporate defendant establishes such minimum contacts by "purposefully avail[ing] itself of the privilege of conducting" business there. *Id.* at 13 (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)). In a similar way, a business based abroad that purposefully avails itself of American markets opens itself up to liability under American intellectual property law.

10

C.

When this case is considered in light of *Abitron*, dInc continues to have a likelihood of success on the merits of its trademark, trade secret, and tortious interference claims.

1.

dInc's trademark infringement claim was brought under 15 U.S.C. § 1114(1)(a), one of the same provisions of the Lanham Act at issue in *Abitron*. *Abitron* made clear that this provision only reaches a defendant if he has committed an "infringing use in commerce, as the Act defines it," in the United States. 600 U.S. at 422.

The Act defines an infringing use as a "use in commerce . . . in connection with the sale, offering for sale, distribution, or advertising of any goods or services" in a manner "likely to cause confusion." 15 U.S.C. § 1114(1)(a). This definition contains three components. The first, "use in commerce," means that "the mark is being used in commerce in the constitutional sense." *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 323 (4th Cir. 2015).[2] The second and third, "in connection with . . ." and "likely to cause confusion," are well established by our case law. *See, e.g.*, *id.* at 322–25; *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 365–67 (4th Cir. 2001).

---

[2] In the context of trademark registration under 15 U.S.C. § 1051, "use in commerce" carries the somewhat stricter definition found in 15 U.S.C. § 1127. *See, e.g.*, *VersaTop Support Sys., LLC v. Ga. Expo, Inc.*, 921 F.3d 1364, 1368–70 (Fed. Cir. 2019). Since *Abitron* refers to an "infringing use in commerce," the § 1114(1)(a) definition rather than the § 1127 definition applies here. 600 U.S. at 422–23; *accord Hetronic Int'l, Inc. v. Hetronic Ger. GmbH*, 99 F.4th 1150, 1162, 1167 (10th Cir. 2024).

This definition plainly encompasses not just "direct sales," but also "marketing, advertising, and distributing activities." *Hetronic Int'l, Inc. v. Hetronic Ger. GmbH*, 99 F.4th 1150, 1163, 1167 (10th Cir. 2024). When direct sales are at issue, they occur in the United States if the customers are in the United States. *Id.* at 1163. When marketing, advertising, and distribution are at issue, they occur in the United States if the intended recipients are in the United States.

We readily conclude that dBV's conduct meets this standard. As we noted in our prior opinion, dBV maintained a website that used dInc's trademark as its domain name and was "virtually identical" to dInc's website, all in an effort to sell "essentially the same" services as dInc. *dmarcian*, 60 F.4th at 140 (quoting *dmarcian, Inc. v. dmarcian Eur. BV*, No. 1:21-cv-67, 2021 WL 2144915, at *18 (W.D.N.C. May 26, 2021)). The website was accessible in the United States and featured a button for customers in "the Americas," and dBV affirmatively sent a message to customers in the United States highlighting its software product. *Id.* at 129, 140. These facts are sufficient to demonstrate marketing or advertising in the United States. dBV also succeeded in luring at least one company based in the United States, Clarizen, to switch providers, which is sufficient to demonstrate a direct sale in the United States. Although our prior opinion applied *Steele*'s effects-focused test, the bottom line remains the same under *Abitron*'s conduct-focused test.

If dBV had passively operated a website that was accessible in the United States, and there was no additional evidence that it had targeted or interacted with customers in the United States, the Lanham Act might well not reach it. Since most businesses around the world have websites that are accessible in the United States, a rule that hinged on web

12

access alone would turn the presumption against extraterritoriality into "a craven watchdog." *Morrison*, 561 U.S. at 266. But on the facts here, which go beyond mere web access, it is likely that dBV used dInc's trademark or its imitation "in commerce . . . in connection with the sale, offering for sale, distribution, or advertising of . . . services" in the United States. 15 U.S.C. § 1114(1)(a). We need not rehash the "likely to cause confusion" analysis, which remains the same in the wake of *Abitron*.

2.

dInc's trade secret claim was brought under the Defend Trade Secrets Act (DTSA), which provides a private civil cause of action to owners of trade secrets that have been misappropriated. 18 U.S.C. § 1836(b)(1). Since *Abitron* concerned the Lanham Act rather than the DTSA, the decision's holding does not directly affect this claim. Nevertheless, *Abitron*'s two-step framework reinforces that dInc is likely to succeed in its DTSA arguments.

The DTSA's private civil action provision quite explicitly "applies to conduct occurring outside the United States," so long as the offender committed "an act in furtherance of the offense . . . in the United States." *Id.* § 1837. This language provides the "unmistakable instruction" from Congress that is needed to rebut the presumption against extraterritoriality at step one of *Abitron*'s framework. 600 U.S. at 418; *see also RJR Nabisco*, 579 U.S. at 338–39 (coming to the same conclusion about a RICO provision that prohibits certain conduct "tak[ing] place outside the United States" (quoting 8 U.S.C. § 1957(d)(2))). That means the DTSA's reach is global.

13

Once the presumption has been rebutted, the only remaining question is whether the facts of the case satisfy "the limits Congress has . . . imposed on the statute's foreign application." *Abitron*, 600 U.S. at 418 (quoting *RJR Nabisco*, 579 U.S. at 337–38). The relevant limit in this DTSA provision is the presence of a domestic "act in furtherance of the offense." 18 U.S.C. § 1837(2).

Although the DTSA applies extraterritorially and the Lanham Act does not, the two statutes are in a certain respect alike. When a foreign company steals an American company's trade secrets and commits some act in furtherance of its theft inside the United States, the DTSA applies. And when a foreign company steals an American company's trademarks and commits an act of infringement inside the United States, the Lanham Act applies. Both laws require culpable domestic conduct for justification. The difference lies only in the nature of the conduct required.

It would be a mistake, then, to conclude that the DTSA's global reach facilitates careless intervention in the affairs of other nations. The DTSA, like the Lanham Act as interpreted in *Abitron*, protects American property interests without running roughshod over international comity interests. While "[f]oreign conduct is [generally] the domain of foreign law," *Microsoft Corp.*, 550 U.S. at 455 (second alteration in original), foreign conduct becomes the domain of the DTSA once the offender has chosen to operate here.

Since dBV has so chosen, the DTSA may reach it. As we noted in our prior opinion, dBV "'originally gained access' to dInc's trade secrets through 'data stored on servers within the United States.'" *dmarcian*, 60 F.4th at 141 (quoting *dmarcian*, 2021 WL 2144915, at *22). An agreement between the parties permitted dBV to use dInc's trade

14

secrets for limited purposes, but dBV went "beyond the scope of the parties' agreement" by using those trade secrets in its own software product—a product that not only replicated dInc's product but directly competed with it. *dmarcian*, 2021 WL 2144915, at *21. dBV then marketed its product in the United States by messaging American customers and featuring an "Americas" button on its website, and it successfully convinced at least one American company, Clarizen, to switch to its product. *Id.* at *22. These efforts involved "using [dInc's] trade secrets to conduct business with customers in the United States." *Id.*

In light of these actions, there is no merit to dBV's contention that it is beyond the reach of the DTSA. If dBV had not gained access to dInc's trade secrets in the United States, and it had not used those trade secrets to seek out customers in the United States, this would be a different lawsuit. But if dBV had not taken those steps, it is possible that this would not be a lawsuit at all. For now, a lawsuit it is, and one in which dInc is likely to succeed on its DTSA claim.

3.

The last of dInc's claims on which the district court found a likelihood of success are North Carolina common law claims: tortious interference with contract and tortious interference with prospective economic advantage.

These are not directly affected by *Abitron*'s holding or its two-step framework. The presumption against extraterritoriality is a federal canon of statutory construction, so it is inapplicable where there is no federal statute at issue. *Wudi Indus. (Shanghai) Co., Ltd. v. Wong*, 143 F.4th 250, 259 (4th Cir. 2025).

15

Nevertheless, state common law and federal statutory law share an essential feature: neither "rule[s] the world." *Microsoft Corp.*, 550 U.S. at 454 (referring to the latter). A state may not simply apply its common law beyond its borders where it has no relationship to a dispute. The federal Constitution, for example, prohibits a state from applying its law to cases in which it does not have "a significant contact or significant aggregation of contacts, creating state interests." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313 (1981). Suffice it to say that state common law must abide by a similar balance to the one struck by *Abitron* between the rights of citizens and regard for other sovereigns.

As we articulated in our prior opinion, dInc's tortious interference claims are consistent with this balance. *dmarcian*, 60 F.4th at 142–43. dInc, a North Carolina entity, had contracts with its existing customers and used its website to solicit new customers, with whom it hoped to execute contracts. *dmarcian*, 2021 WL 2144915, at *23–24. dBV sought to interfere with these existing and prospective contractual relationships by cloning dInc's website and marketing its own services to some of the same customers. It did succeed in winning over at least one customer, Clarizen, that had previously been a customer of dInc. The harm from its conduct befell dInc. This chain of events touched North Carolina sufficiently closely to justify the application of North Carolina tort law.

## D.

Given dInc's continued likelihood of success on the merits of its trademark, trade secret, and tortious interference claims, the second amended preliminary injunction is a permissible restraint on dBV.

16

"The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). When a defendant is likely violating the rights of a plaintiff, a district court may issue a preliminary injunction that provides the plaintiff "complete relief" from the ongoing violation. *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). The court may not, however, provide more relief than that. *Id.* The scope of the remedy afforded by the injunction should match the scope of the violation it seeks to prevent.

Since neither the scope of the ongoing violation nor the remedy that would best prevent it are always clear, especially at the preliminary stage, district courts have some leeway when crafting an injunction. It is "an exercise of discretion and judgment," *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017), characterized by "[f]lexibility rather than rigidity," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The match between violation and remedy must be approximate, but it need not be perfect.

Since the scope of the second amended preliminary injunction approximately matches the scope of dBV's likely violations, the injunction is permissible.

The fourth and fifth decretal paragraphs are supported by dInc's Lanham Act claims. Although the Lanham Act prohibits only domestic trademark infringement, the decretal paragraphs respect this limitation by enjoining use of dInc's name and trademarks only on websites "accessible to IP addresses from the United States." J.A. 2070–71. The injunction need not be so tailored that it prohibits the precise manner in which dBV likely violated the Lanham Act—by, for example, featuring a button for American customers and executing a direct sale in the United States. "The more specific the order, the more

17

opportunities for evasion," and an injunction that can be evaded is not one that provides complete relief. *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 598 (7th Cir. 2001) (quoting *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir. 1985)).

The other decretal paragraphs of the injunction are supported by dInc's DTSA and tortious interference claims. The first and second paragraphs apply to North and South America, Oceania, and part of Asia, and the third, sixth, and seventh paragraphs apply worldwide. Given the express extraterritorial scope of the DTSA and the long arm of North Carolina tort law, we see no errors in the territorial reach of these paragraphs.

E.

Finally, dBV challenges the injunction's third decretal paragraph on additional grounds. dBV says the paragraph violates Federal Rule of Civil Procedure 65(d)(1), which requires that an order granting an injunction "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

The rule is "no mere technical requirement[]" that can be lightly brushed off. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). It embodies the serious substantive goals of "prevent[ing] uncertainty and confusion on the part of those faced with injunctive orders" and enabling "intelligent appellate review." *Id.* at 476–77.

At the same time, the rule does not require that every injunction read like an instruction manual. There are good reasons why a district court might choose to craft an injunction in general terms, including that, as the preceding discussion noted, a more specific order can be more easily evaded. In a trade secrets case, the district court may also

18

wish to avoid inadvertently disclosing the plaintiff's trade secrets by describing them with too much particularity. *Minn. Mining & Mfg. Co.*, 259 F.3d at 597–98.

For these reasons, our cases have taken a practical approach to the Rule 65(d)(1) inquiry. We consider "the language of an injunction . . . in the light of the circumstances surrounding its entry." *United States v. Fuller*, 919 F.2d 139 (Tbl.), 1990 WL 190495, at *3 (4th Cir. Dec. 4, 1990) (per curiam). When evaluating whether an injunction provides a defendant fair notice about what is proscribed, we will not "strip[] it of its context." *Kadel v. Folwell*, 100 F.4th 122, 160 (4th Cir. 2024) (en banc), *vacated on other grounds by Folwell v. Kadel*, 145 S. Ct. 2838 (Mem.) (2025).

The third decretal paragraph prohibits dBV from "making changes to the trade secret source code." J.A. 2070. In context, this is sufficiently clear to pass Rule 65(d)(1) muster. The district court found in 2021 that dBV likely misappropriated the trade secrets dInc had in its source code, and we affirmed that finding on appeal in 2023. *dmarcian*, 60 F.4th at 141–42. The district court repeated the finding when it issued the second amended preliminary injunction in 2024. The "trade secret source code" referenced in the injunction is the same trade secret source code that has been the subject of the likelihood of success finding all along. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 321–22 (4th Cir. 2000) (affirming a similar injunction). If dBV's real objection is to the trade secret definition underlying the likelihood of success finding, the time to bring it has long passed.

\*       \*       \*

In affirming the injunction, we remain cognizant of the fact that this case and the litigation in the Netherlands have a degree of overlap. We wish to express our sincere

19

appreciation for the conscientious manner in which our colleagues in the Dutch judiciary have approached their end of the case.

We have no desire to indiscriminately sweep activities in the Netherlands into the net of American law. As the facts of this case reveal, however, intellectual property disputes often involve interrelationships that cannot be confined to a single sovereign. If we were to vacate the preliminary injunction, we would be authorizing a foreign company to steal the intellectual property of an American company, use the stolen property to target American customers, and then claim its foreign status as a shield against American law. This American company and others in its shoes would be left defenseless. Respect for other sovereigns does not require us to countenance such behavior.

## III.

Having addressed dBV's appeal of the second amended preliminary injunction, we turn to dBV's appeals of the correction order and the contempt order. We dismiss both for lack of appellate jurisdiction.

## A.

Recall that the district court issued the correction order in response to proceedings in the Netherlands. dBV, in the course of opposing a stay, told the Dutch court that the American lawsuit involved different subject matter and was filed later than the Dutch lawsuit. These arguments initially succeeded in convincing the Dutch court not to enter a stay. The district court, however, held that dBV's comments were misrepresentations and ordered dBV to submit a document to the Dutch court correcting them. When dBV submitted the document, the Dutch court reversed itself and entered a stay.

20

Generally, a court of appeals has jurisdiction to review a district court order only if the order is "final." 28 U.S.C. § 1291. An order is final when "nothing remains for the district court to do" in the case "except execute the judgment." *United States ex rel. Lutz v. United States*, 853 F.3d 131, 136 (4th Cir. 2017). dBV does not argue, nor could it, that the correction order is final. Instead, it argues that the correction order fits into three narrow exceptions to the finality rule.

1.

First, dBV says we have jurisdiction over the correction order pursuant to 28 U.S.C. § 1292(a)(1). This provision permits a court of appeals to consider an interlocutory appeal of an injunction or an order that has the "practical effect" of an injunction. *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83 (1981). If the order has the "practical effect" of an injunction but is not styled as one, § 1292(a)(1) only permits interlocutory review when declining review would cause "serious, perhaps irreparable, consequence" and prevent the order from ever being "effectually challenged." *Carson*, 450 U.S. at 84.

The correction order does not satisfy these requirements. It is not styled as an injunction and, even if we assume it has the practical effect of an injunction, we see no irreparable harm from declining to review it now. To put a finer point on it, there are no harms caused by the correction order that we could remedy now but could not remedy in an appeal from a final judgment.

The primary harm to which dBV points is harm to international comity principles. The correction order, dBV says, improperly "interfered with the Dutch proceedings." Supp. Opening Br. at 52. Even if we assume this allegation is correct, however, it is retrospective.

21

Because the document at the center of the correction order has been filed with the Dutch court, the Dutch proceedings have already been interfered with. "[W]e cannot unring that bell," either now or after a final judgment. *United States v. Under Seal*, 853 F.3d 706, 724 (4th Cir. 2017).

This appeal is not like ones addressing the wrongful disclosure of documents. In those appeals, we have consistently held "that a party's 'continued possession' of information wrongfully disclosed constitute[s] an ongoing injury" capable of at least partial remediation by an order telling the party to return or dispose of the documents. *Stanko v. Stirling*, 109 F.4th 681, 698–99 (4th Cir. 2024) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)). In this case, by contrast, there is no ongoing injury to international comity principles. The Dutch proceedings are currently being left alone. In fact, trying to unwind past interference in the Dutch proceedings would require further interference. The harm to international comity, real or imagined, is simply irremediable.

The second alleged harm dBV identifies is ongoing rather than retrospective. Because the Dutch proceedings are currently stayed as a result of the correction order, dBV says it is losing the opportunity to press its Dutch claims. Even if we assume that dBV is right, however, we possess no means of remedying this harm.

"It is a federal court's judgment, not its opinion, that remedies an injury." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023). A court must "be able to afford relief *through the exercise of its power*, not through the persuasiveness or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment)). We

22

have no power to order the Dutch court to lift its stay. Instead, we can only explain whether or not, in our view, dBV accurately told the Dutch court about the subject matter and start date of the American litigation. However persuasive our thoughts on that matter may be, it would be a quintessential advisory opinion.

Consider the long chain of events that would need to occur in order for any views of ours to have an impact in the real world. If we were to vacate the correction order, the Dutch court would need to somehow be informed of the vacatur; the Dutch court, once informed, would need to be sufficiently moved by our analysis of the issues that it would choose to revisit its prior decision to enter a stay; and the Dutch court, once it revisited its prior decision, would need to come to a different conclusion about the subject matter and start date of the American litigation, leading it to lift the stay. Without deeper knowledge of the Dutch legal system, we are poorly positioned to determine whether any of these events, let alone all of them, are likely. The chain of causation is simply too speculative and attenuated to sustain a plausible claim that dBV's injury is remediable.

That leaves one final harm: the $400,000 fine the district court imposed on dBV for what, in its view, was contumacious failure to follow the correction order. The tools needed to remedy this harm, unlike the tools needed for the other harms, are within our toolbox. If we were to vacate the correction order, the compensatory fine imposed for violating it would necessarily be invalid. *United States v. United Mine Workers of Am.*, 330 U.S. 258, 295 (1947) (noting, with respect to compensatory civil fines, that "[t]he right to remedial relief falls with an [order] which events prove was erroneously issued"). Monetary harms, however, are by definition reparable. If dBV has paid a fine that should not have been paid,

23

then it can be refunded appropriately after a final judgment. Given the strong "congressional policy against piecemeal review," there is no need for us to consider the question now. *Carson*, 450 U.S. at 84.

2.

Second, dBV says we have jurisdiction over the correction order pursuant to the collateral order doctrine. This doctrine permits a court of appeals to review orders "that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)).

The correction order would not be effectively unreviewable later for the same reasons that declining review now would not cause irreparable harm. The only remediable harm the correction order has caused is the fine imposed on dBV for failing to follow it, and that can be straightforwardly refunded—if a refund is merited—at any time. Since the correction order is not effectively unreviewable, we need not consider whether it is conclusive or resolves important questions separate from the merits.

3.

Third, dBV says we have pendent appellate jurisdiction over the correction order. This doctrine permits us to review an order "not otherwise subject to immediate appeal when [the] issues [it raises] are so interconnected with immediately appealable issues that they warrant concurrent review." *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006). This standard is met "only (1) when an issue is 'inextricably intertwined' with a

24

question that is the proper subject of an immediate appeal; or (2) when review of a jurisdictionally insufficient issue is 'necessary to ensure meaningful review' of an immediately appealable issue." *Id.* (quoting *Swint*, 514 U.S. at 50–51).

The only order that is the proper subject of immediate appeal is the second amended preliminary injunction, and the correction order is too far removed from it to justify pendent jurisdiction. Although both orders superficially raise international comity issues, they are neither intertwined nor interdependent. The issues implicated by the correction order involve intervention in foreign judicial proceedings, whereas the issues implicated by the injunction involve the extraterritorial application of United States law.

dBV argues that deciding whether the correction order was justified would require deciding whether dBV misrepresented the subject matter of the American litigation in its arguments to the Dutch court, which would in turn require deciding the territorial scope of the laws at issue in the American litigation. Territorial scope is, of course, the primary issue raised by the second amended preliminary injunction. But once again, defining the issue at this superficial level is misleading. The scope questions presented by the correction order concern the reach of United States law at the time dBV described it to the Dutch court—in other words, before *Abitron*—while the scope questions presented by the injunction concern the reach of United States law after *Abitron*. These questions are not inextricably intertwined, and deciding the former is not necessary to decide the latter. Assuming pendent jurisdiction here would disregard the cardinal rule that the doctrine be one of "limited and narrow application driven by considerations of need." *Rux*, 461 F.3d at 475.

25

Although declining to exercise jurisdiction over the correction order means the order will remain in place, it does not mean that we give the order our stamp of approval. To the contrary, we recognize that the order raises weighty issues. On the one hand, a district court has the power to issue foreign directives "to protect the integrity" of its proceedings. *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 480 (4th Cir. 2018). On the other hand, "the court should use that power 'sparingly'" given the serious risks posed by its exercise. *Id.* at 479 (quoting *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012)). These considerations will need to be carefully weighed if the correction order is appealed after a final judgment.

## B.

We now turn to the contempt order. Recall that the correction order directed dBV to submit a document to the Dutch court. dBV did submit the document. But the district court concluded the document was not submitted in the manner directed by the correction order, so it held dBV in civil contempt and ordered dBV to pay dInc $400,000.

dBV argues the contempt order is either an appealable final order, an appealable injunction, or an appealable collateral order. None of these arguments, however, overcomes the "settled" rule that a party may not bring an interlocutory appeal of a civil contempt order that imposes a fine. *Fox v. Capital Co.*, 299 U.S. 105, 107 (1936). Instead, the party must seek review of the order "in connection with an appeal from a final judgment." *Id.* This rule applies "[i]n normal civil litigation," *In re Bestwall, LLC*, 99 F.4th 679, 684 (4th Cir. 2024), so it applies here.

26

dBV protests that this case is different because the contempt order did more than impose a fine. The order also suspended dBV's attorney from practicing law in the forum in which this case is being litigated, which had the effect of disqualifying the attorney from the case. But "orders disqualifying counsel in a civil case are not collateral orders subject to immediate appeal" by the party whose counsel is disqualified. *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 426 (1985). Nor can they be characterized as appealable final orders under 28 U.S.C. § 1291 or appealable injunctions under § 1292(a)(1), which would render the *Richardson-Merrell* rule a nullity. *Id.* at 430. Two types of contempt orders that are each unappealable on their own—an attorney disqualification and a compensatory monetary sanction—do not become appealable because they are issued together.

dBV's theory of pendent appellate jurisdiction might present a more challenging question, except that it relies upon jurisdiction over the correction order to justify jurisdiction over the contempt order. Since we lack the former, there is no question that we lack the latter.

As with the correction order, our inability to review the contempt order does not mean we give it our stamp of approval. In our contemporaneous decision in a related appeal, we vacate the contempt order as applied to dBV's attorney. *See dmarcian, Inc. v. Pressly McAuley Millen*, No. 25-1085, --- F.4th --- (4th Cir. 2026). If dBV appeals the contempt order after a final judgment, the court will have the opportunity to consider whether to vacate it as applied to dBV.

27

IV.

dBV requests one more item: reassignment to a new district judge on remand. We deny its request.

A court of appeals may order reassignment pursuant to its authority to "require such further proceedings . . . as may be just." *Liteky v. United States*, 510 U.S. 540, 554 (1994) (quoting 28 U.S.C. § 2106). But reassignment is not a costless step. When it occurs after substantive proceedings have already taken place in the district court, it imposes "burdens" on the new judge, on the litigants, and on the judicial system itself. *United States v. McCall*, 934 F.3d 380, 384 (4th Cir. 2019). As a result, it is an unusual remedy that is "only warranted in 'unusual circumstances.'" *United States v. Galecki*, 932 F.3d 176, 195 (4th Cir. 2019) (quoting *United States v. North Carolina*, 180 F.3d 574, 582–83 (4th Cir. 1999)).

In deciding whether the circumstances are unusual enough to merit reassignment, "we may consider (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected'; '(2) whether reassignment is advisable to preserve the appearance of justice'; and '(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.'" *McCall*, 934 F.3d at 384 (quoting *United States v. Nicholson*, 611 F.3d 191, 217 (4th Cir. 2010)).

Reassignment is not warranted here. The district judge in this case has presided over it for more than five years, becoming intimately familiar with a complex set of facts and claims. The last time we were asked to review his work in this case, we largely affirmed it.

28

It is true that the correction order and the contempt order were strict sanctions against dBV, but it is also true that the judge has ruled in dBV's favor, including by dismissing dInc's copyright claim. This is a challenging case, and the district court has displayed a conscientious approach to it. The fact that a litigant is displeased with a judge's rulings is hardly sufficient grounds to direct reassignment to a new judge upon remand. Ultimately, we see no reason why this judge cannot be a fair and impartial adjudicator moving forward.

## V.

The last time this case was before us, we noted that "[c]ases like the current one will involve a balance." *dmarcian*, 60 F.4th at 147. That caution is even truer now.

When interpreting statutes, *Abitron* instructs that a balance must be struck between respect for the interests of other sovereigns and protection for the rights of Americans. The second amended preliminary injunction gets this right by enjoining dBV on the basis of its domestic conduct.

In the district court, the regrettable series of events that culminated in the correction order and the contempt order offers an instruction about a different sort of balance—balance between the district court's prerogative to protect the integrity of its proceedings on the one side, and the care it must take before intervening beyond its proceedings on the other. Since we lack jurisdiction over these orders, we save for another day the tasks of defining the balance with greater precision and assessing whether the orders got it right.

29

The second amended preliminary injunction is hereby affirmed and the remainder of dBV's appeal is dismissed. The motion to stay the injunction pending appeal is denied.

Now that the application of United States law to dBV is settled, the parties may proceed to the main events in this litigation. The administrative stay of trial is hereby lifted.

*SO ORDERED*